**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-170 (CJN)** |
| **v.** | : | |
| | : | |
| **DAVID ELIZALDE,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.   David Elizalde has been convicted of one second degree misdemeanor, a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four).  For the reasons set forth herein, the government requests that this Court sentence Elizalde to a period of probation of 36 months with a condition of intermittent confinement totaling 30 days. The government also requests that this Court impose 60 hours of community service.

I.      **Introduction**

Defendant David Elizalde, 46 years old, is a Leading Petty Officer in the United States Navy serving as an Active-Duty Military Aviation Mechanic.  ECF 44 at 11.  He has been a sailor since 2007.  *Id*.  Elizalde participated in the January 6, 2021, attack on the United States Capitol— a violent attack that interrupted Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power, injured more than one hundred police officers, and

1

resulted in more than $2.9 million in losses.[1]

Elizalde was convicted at trial of violating 40 U.S.C. § 5104(e)(2)(G). The government's recommendation is warranted here because Elizalde (1) saw and heard police officers defending the Capitol with munitions such as flash bangs and pepper spray, and personally felt the effects of pepper spray, (2) saw rioters breach the police line on the northwest staircase, and filmed multiple acts of violence against the police outside of the Capitol Building, (3) breached the Capitol Building through a door that was obviously damaged and walked over broken glass as he entered, all while ignoring a blaring alarm, and (4) furthered the riot at the Capitol despite his sworn obligation to defend the nation and the Constitution as an active duty member of the armed forces of the United States.

The Court must also consider that Elizalde's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. Indeed, as this Court noted, "everyone in the crowd, in fact, contributed to the disorder that day." Tr. 548:12-14. But for his actions alongside so many others, the riot likely would have failed, as this Court noted. Here, the facts and circumstances of Elizalde's crime support a sentence of 36 months of probation with a condition of intermittent confinement totaling 30 days, and 60 hours of community service

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

in this case.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 1-1 at 1-2.

*Defendant Elizalde's Role in the January 6, 2021 Attack on the Capitol*

Elizalde drove from southeastern Virginia to Falls Church, Virginia, on January 5, 2021, and stayed overnight in a hotel in that area.  Trial Tr. 100:19-101:1 (Jones).  The next day, on January 6, 2021, Elizalde travelled to the District of Columbia via the metro to an area near the National Mall and the Washington Monument.  *Id*. at 101:1-5 (Jones).

Elizalde attended the rally held by former President Donald Trump at the Ellipse, referred to as the "Stop the Steal" rally.  Trial Tr. 53:3-7 (Jones); *see* Ex. 503 (panorama taken by Elizalde of the assembled crowd near the Washington Monument on the Mall).  Elizalde remained at the Mall until after former President Trump had begun to deliver his remarks, listening to at least a portion of those remarks.

Even before the speech ended, Elizalde joined the crowd heading to the Capitol Building via Constitution Avenue.  Trial Tr. 59:3-24 (Jones); *see* Ex. 504.  At some point during the day, and likely at or about this time, Elizalde purchased a "Veterans for Trump" flag, which he brought with him to the Capitol Building.  *Compare* Ex. 206 *with* Ex. 304; Trial Tr. 88:2-89:7 (Jones). Elizalde also brought a cell phone and GoPro-style camera with him to the Capitol.[2]

---

[2] Images and video from the cell phone were provided by Elizalde and recovered by investigators. Notably, Elizalde did not provide investigators with images or video captured by his GoPro-style camera and did not disclose the existence of his GoPro or associated images or video to investigators.  *See* Trial Tr. 87:2-11 (Jones) ("He appears to be taking photographs or videos using

On January 6, Elizalde noticed numerous barricades, some of which he acknowledged the crowd had already forced through.  Trial Tr. 105:24-106:2;[3] *see also* Ex. 812 39:20-30 (Elizalde characterizing what he saw as "definitely a lot of barricades").  Once within the restricted area of the Capitol Grounds, Elizalde took the path roughly outlined below (Image 1) with points of interest marked via red dot annotations:



*Image 1: Elizalde's Approximate Path on Capitol Grounds (annotated)*

At point 1, Elizalde recorded a video, Ex. 508 (Image 2).  In the video, he captured: (a) Capitol Police (red square below) stationed on the west terrace steps aiming riot control munitions at rioters and instructing them to disperse/leave, (b) rioters (yellow square below) climbing over walls and railings, and (c) first responders (blue square below) administering CPR to an unconscious rioter.  *See* Trial Tr. (DesCamp) 174:17-180:14.

_____

a GoPro-style camera."); 87:18-22 (Jones) ("Now, during your interview of the defendant in this case, did the defendant ever indicate to you what he brought to the Capitol on January 6? A. He stated he brought his cell phone. Q. Did the defendant ever mention a GoPro? A. No, he did not.").

[3] Elizalde originally told investigators that he did not recall any barricades or having to move past any barricades on January 6, 2021.  It was only in subsequent interviews that Elizalde indicated that he saw barricades on January 6, 2021, and was aware that the crowd of rioters had forced its way through at least some of the barricades prior to his observations.  Trial Tr. 106:1-9.

At trial, Sgt. DesCamp of the Capitol Police testified that he "was shock[ed] at first because, like I said, we never deployed those [less-than-lethal] launcher systems" prior to January 6, 2021.  Trial Tr. 169:6-6.  He saw a "CDU platoon was holding a line at the bottom of the stage area, and they were all being assaulted by different individuals."  *Id*. at 171:9-11.  The "size of the crowd" that Elizalde was a part of, "a hundred percent" affected USCP's ability to create space between defending officers and rioters; "As soon as you would stop one, the next one was there." *Id*. at 172:4-7.

None of these sights (depicted below) dissuaded Elizalde from remaining on the restricted grounds or, later proceeding to the Capitol.



*Image 2: Image from video by Elizalde showing police firing munitions (red square), rioter receiving medical attention (blue square), rioters climbing over walls (yellow square).*
*Ex. 508, 0:47*

Following these events, at approximately 2:00 p.m., police officers walked past Elizalde along the pathway leading to the Lower West Terrace.  In front of Elizalde, rioters assaulted police officers, and Elizalde personally witnessed and recorded multiple violent altercations between the rioters and police.  Elizalde was captured on multiple body-worn cameras (BWC) of officers.  *See, e.g.,* Ex. 201.A2, Ex. 202.A2 (Image 3), Ex. 202.B2, Ex. 203.A2.



*Image 3: Elizalde as captured by Lt. Hackerman's BWC - Ex. 202.A2.*

Elizalde's own footage graphically captured an attack addressed in Lt. William Hackerman's trial testimony.  *See, e.g.*, Ex. 514.A2.  Lt. Hackerman testified that he was assaulted and squeezed to the point where he could not breathe on January 6, 2021, saying, "I wasn't prepared for that moment.  I could say, once they squeezed me so hard that I couldn't breathe, that's kind of when I was very, very scared that -- I really didn't know, at that moment, I was definitely extremely scared."  Trial Tr. (Hackerman) 318:17-21.  This assault and squeeze was

witnessed by Elizalde,  and Elizalde recorded much of the attack.  Lt. Hackerman concluded his testimony saying that "[January 6] doesn't compare . . . It does not compare to any day I've probably ever lived." Trial Tr. 354:16-19.

 

*Image 4: At left, (Ex. 514, 0:05) image from Elizalde's recording of the rioters clashing with MPD Lt. Hackerman before the crush;at right, (Ex. 514, 1:44) later image from Elizalde's recording showing rioters surrounding and crushing MPD officers.*

The harrowing events captured by Elizalde, Ex. 514, happened right in front of him; even so, Elizalde took no action to assist, help, defend, or otherwise protect the police officers as they were attacked by the riotous mob; rather, he remained part of the crowd.[4]  He stood with rioters,

---

[4] "Q. When you were surrounded by the crowd, who was a threat in the crowd? A. The whole crowd. Q. The members of the crowd at the front pushing on you? A. In the front, back, side. If they were there, they were just -- they weren't helping. It made everything I had to do harder." Trial Tr. (Hackerman) 319:8-15.

recording events but leaving police officers to fend for themselves.[5]   Elizalde remained in the vicinity of the attack against police for several minutes following its conclusion .  *See* Ex. 515.  He photographed himself holding his "Veterans for Trump" flag in front of the staircase after rioters overran police officers holding the line.  Ex. 517, Image 5.



*Image 5: Elizalde in front of Lower West Terrace stairs (Ex. 517 - reversed)*

About an hour after the assault on police on the west front Elizalde stepped over a low wall as he made his way to the Upper West Terrace at about 3:09 p.m.  Elizalde went to the Senate Wing Door on the Upper West Terrace, passing by a cordon of police officers, who captured his

---

[5] "Obviously, Mr. Elizalde didn't engage in that conduct directed to Lieutenant Hackerman. But, in my view, the government proved beyond a reasonable doubt that everyone in the crowd, in fact, contributed to the disorder that day.  [A]s a result, Mr. Elizalde's actions and presence had the [e]ffect, in fact, of impeding and disrupting the orderly conduct of police officers' efforts to secure the building[.]"  Trial Tr. 548:15-18 (Nichols, J.).

presence with their BWC.  *See* Ex. 206 (recording Elizalde on the Upper West Terrace with his flag and GoPro style camera).  Elizalde took a photo of the police cordon he encountered at the Upper West Terrace and continued on to the Senate Wing Door.  *See* Ex. 524.

Passing police officers, Elizalde proceeded to the Senate Wing Door and filmed fellow rioters climbing into the Capitol building through broken-out windows.  *See* Ex. 528.

Elizalde filmed as he entered through the Senate Wing Door and passed by shattered windows.  He walked over broken glass on the floor as alarms blared, and rioters chanted "USA!".  *See* Ex. 530.



*Image 6: screen capture from Elizalde's video of his entry into the Capitol Building, showing the broken-out glass in the door he entered through.  (Ex. 530 (cropped) (zoom inset), 0:03)*

Elizalde entered the Capitol Building through the Senate Wing Door at about 3:25 p.m.  *See* Ex. 105, Image 7 (below).



*Image 7: Elizalde entering the Capitol Building (Ex. 105, 3:25:07 p.m. timestamp) (zoom inset)*

He continued inside until he encountered a police line and U.S. Capitol Police Officer Jared Pias directed him to leave.  Elizalde recorded his interaction with Officer Pias.  Ex. 530 (1:16-1:20). Notably, until this point where he was personally directed by police to leave, Elizalde—despite his military experience and familiarity with security challenges presented by a mob—disregarded every other indication that he should not have entered the Capitol or remained in its restricted grounds.

After the interaction with Officer Pias, Elizalde exited the Capitol at about 3:28 p.m. through the same Senate Wing Door that he entered through.

*Elizalde's Pre-Charge NCIS/FBI Interviews*

Elizalde gave interviews to Naval Criminal Investigative Service (NCIS) and FBI investigators on December 21, 2021, Ex. 811, and February 8, 2023, Ex. 812.  In the first interview, Elizalde indicated his willingness to provide investigators access to his cell phone (and later did so) but did not inform investigators that he filmed events on January 6 with his GoPro-style camera or provide the images taken with it to investigators, even though he was asked if he had photos or

10

video of January 6.[6]

During his December 21, 2021, interview, Elizalde admitted that he observed rioters fighting with the police but expressed a concern for his own safety as a result, rather than for the officers.  Moreover, although Elizalde admitted that, in hindsight, he made a bad decision on January 6th, he continues to view it as an historic event.  Rather than expressing remorse for the violence he saw and filmed against police officers and an unconscious rioter receiving chest compressions, he said as follows:

> I know when all this is past and gone, ten years from now, twenty years from now, I know people are going to be talking about it.  And they're going to be like, "hey, were you there?"  And I was going to be like, "yes and here's my story," you know? It was just historical.

Ex. 812, 40:41-41:01.

### The Charges and Verdict

On May 16, 2023, the United States charged Elizalde by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G).  On December 6, 2023, following a two-day bench trial, this Court found Elizalde guilty of Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G).

### III.   Statutory Penalties

Elizalde now faces a sentence of up to six months of imprisonment and a fine of up to $5,000 for violating 40 U.S.C. § 5104(e)(2)(G).  As this offense is a Class B Misdemeanor, the

---

[6] Ex. 811, 24:14-52 ("Q: Did you take pictures or video that day? A: Yes, I do have a few pictures, I think.  Q: Would you be willing to share those pictures or videos if we asked?  A: Yeah.  Q: Where are they at, are they on your phone that you have right now?  A: I don't have my phone but yeah, they're back in the shop.")  While Elizalde agreed he would share the photos and video he took on January 6 with investigators, he later did not provide any photos or video from his GoPro-style camera or inform investigators of that source of photo or video.  38:40-44 ("Q: With regards to the pictures and videos, just hold onto those.  A: *nods* um-hum").

Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. As described below, the Section 3553(a) factors weigh in favor of a sentence of 36 months of probation with a condition of intermittent confinement of 30 days, and 60 hours of community service in this case.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 579 F. Supp. 3d 1, 8 (D.D.C. 2021). While assessing Elizalde's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Elizalde, the absence of violent or destructive acts is not a mitigating factor. Had Elizalde engaged in such conduct, he would have faced additional criminal charges.

Elizalde did, however, engage in aggravating conduct.  The decision to stand with rioters on the Capitol Grounds and then breach the Capitol Building, even after observing and filming police under assault, is especially troubling when made by an active-duty serviceman. Moreover, Elizalde declined to accept responsibility for his conduct and has not expressed any remorse, and as a result, there is minimal, if any, post-January 6 mitigating conduct for the Court to consider.

*Findings of the Court*

The Court made several factual findings in its verdict that bear on the nature and

12

circumstances of Elizalde's offense conduct:

- Elizalde's "conduct inside the Capitol on January 6 was . . . conduct that would disrupt the orderly business of Congress" (Trial Tr. 539:10-12)

- "Elizalde did engage in disorderly or disruptive conduct in a restricted building or grounds. His entering of the Capitol grounds and building tended to disrupt and disturb the public peace and to undermine public safety."  (Trial Tr. 546:21-25)

- "[T]he disorder on January 6 would not have been possible without a crowd. In my view, the government proved . . . , that each individual's presence that day added to the disorder and distress of that day. And, thus, that Elizalde, through his more than two hours' presence walking around and the like, that he had engaged in disorderly or disruptive conduct; that he, in fact, did."  (Trial Tr. 547:8-16)

- "Mr. Elizalde's actions and presence had the affect, in fact, of impeding and disrupting the orderly conduct of police officers' efforts to secure the building, Secret Service's efforts to protect the vice president and his family and Congress' efforts to consider and certify the electoral vote."  (Trial Tr. 548:15-20)

- "Elizalde knew he was engaging in disorderly conduct. A reasonable person would know that his presence among the crowd, especially the crowd that ended up entering the Senate wing, would disrupt public peace and undermine public safety by making it more difficult for law enforcement to restore calm.  [And] Elizalde, in particular, would have been aware of this as a Naval officer who worked in security and law enforcement himself. After all, he followed a crowd into the Capitol where he saw people rushing in, climbing the scaffold, fighting the police."  (Trial Tr. 548:23-49:8)

- "[T]here is no reasonable doubt in my mind that Elizalde knew that his presence in the

Capitol and on Capitol grounds contributed to the general disorder of that day; and that he willfully decided, nevertheless, to enter and remain on the grounds and the building." (Trial Tr. 551:9-13)

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of probation with a condition of intermittent confinement in this matter.

### B. Elizalde's History and Characteristics

As set forth in the PSR, Elizalde does not have a criminal history, a history of drug or substance abuse, or any recent mental conditions that would affect his judgment. Elizalde has been a naval aviation mechanic on active duty since 2007 and is currently a Leading Petty Officer, having been stationed around the United States and in Rota, Spain. Elizalde has been compliant with his conditions of pre-trial release.

While Elizalde's military service is laudable, it renders his conduct on January 6 all the more troubling. As an active-duty naval serviceman, especially one who had been assigned to work base security multiple times, Elizalde was well aware that unauthorized persons do not have the right to enter restricted government grounds or buildings, especially not as part of an angry mob. His voluntary decision to storm a guarded government building is disturbing in light of his current oath to protect and defend the country and our constitution from enemies, foreign and domestic, and bear true allegiance to the same. *See* 10 U.S.C. § 502 (enlistment oath).  In this case, Elizalde's conduct, which contributed to undermining our constitutional order while he served on active duty, demonstrates a very real need for specific deterrence.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As

with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence (to deter crime generally) and specific deterrence (to protect the public from further crimes by a defendant). 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. As this Court previously stated, "Future would-be rioters must be deterred." *United States v. Thomas Gallagher*, 1:21-CR-041 (CJN) Sentencing Tr. 10/13/21 at 37:16-17.

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider. *United States v. Pollock et al.*, 21-CR-447 (CJN) Sentencing (Michael Perkins) Tr. 53 ("And if there is such a thing, January 6th wasn't an ordinary violent riot but one that interfered with the counting of electoral votes and the peaceful transition

of power, which is one of the bedrocks of our democracy.").

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of imposition of a sentence of probation that includes intermittent confinement.

Here, Elizalde was, as the Court noted, "a trained Naval officer, [who was] well aware" of the results of his actions on January 6. "[T]hat is, that he knew that his presence at the Capitol would likely disturb what Congress was doing. And . . . , in my view, [] he was aware that Congress was, in fact, meeting that day." Trial Tr. 551:24-52:4. Yet, even so, "Mr. Elizalde knowingly and willfully engaged in disorderly or disruptive conduct on January 6th" "with an inten[t] to disrupt the public peace and undermine public safety." Trial Tr. 551:6-7, 551:2-3. Elizalde has not accepted responsibility for those actions.

In an environment in which many voices continue to sow discord and distrust, the potential for a repeat of January 6 remains. Elizalde's presence at the Capitol for over two hours, the fact that he filmed violence against police officers, and then entered the Capitol in spite of training in military base security, merits a sentence sufficient to deter him specifically, and others generally, from repeating their actions on January 6th.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assaults on police officers, to conspiracy to corruptly interfere with Congress.[7] This

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

Court must sentence Elizalde based on his conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Elizalde has been found guilty by this Court of Count Four of the Information charging him with unlawfully parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

This court has previously sentenced defendants convicted of a single count of unlawful parading, demonstrating, or picketing within the Capitol Building, 40 U.S.C. § 5104(e)(2)(G).  For example, this Court sentenced Jonathan Sanders to 36 months of probation, 60 hours of community service, and $500 restitution following a guilty plea to a single count of violating 40 U.S.C. § 5104(e)(2)(G).  *United States v. Sanders*, 21-cr-384 (CJN), ECF 36.  In that case, Sanders, an Air Force veteran, (1) understood the severity of the violence surrounding the Capitol at the time

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

he entered the building; (2) entered the building after seeing tear gas being dispersed into the crowd from the building and a rioter trying to break a window before he entered; (3) nonetheless went inside the U.S. Capitol despite what he observed being done in and around the Capitol and; (4) showed no remorse when interviewed later by the FBI. *Id*., ECF 31 at 2. Worse, here, Elizalde saw assaults against police officers and was an active-duty serviceman, unlike Sanders who was a former serviceman. Further, Elizalde has not shown remorse or accepted responsibility for his crime. Accordingly, a harsher sentence is appropriate.

In *United States v. Bustos et al.*, 22-CR-16 (CJN), the Bustos's were each sentenced to 24 months of probation, 30 hours of community service, and $500 in restitution following guilty pleas to single counts of violating 40 U.S.C. § 5104(e)(2)(G). *Id*., ECF 67, 69. In those cases, the Bustos's entered the Capitol, remained inside for about 24 minutes, and left without interaction or instruction from law enforcement. *Id*. ECF 61. Unlike the Bustos's, Elizalde personally witnessed and filmed violence, required law enforcement instruction before deciding to leave, and was present for over two hours. The Bustos's did not occupy positions of trust, like Elizalde did as an active military service member. And, unlike Elizalde, the Bustos's both accepted responsibility. A harsher sentence for Elizalde would account for the aggravating circumstances present here.

In *United States v. Galloway*, 22-CR-12 (CRC), Galloway was sentenced to thirty days of incarceration, restitution of $500, and a fine in the amount of $1000. 22-CR-12, ECF 36. Galloway, a former serviceman in the U.S. Navy (four years), entered the Capitol after seeing police officers using pepper spray and, like Elizalde, had not offered a sincere expression of remorse for his conduct. ECF 31 at 2. The Court remarked that, "Galloway's former military service makes his conduct on January 6 more egregious, and his lack of remorse further

demonstrates a very real need for specific deterrence in the form of incarceration." *Id*. at 13.

Additionally, Elizalde is subject to a fine under 40 U.S.C. § 5109(b), which permits imposition of a fine pursuant to 18 U.S.C. § 357(b)(6) of not more than $5,000.[8]

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Intermittent Confinement as a Condition of Probation

As a condition of probation, a court may order that the defendant be incarcerated "during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(1); *see also United States v. Little*, 78 F.4th 453, 461 n.7 (D.C. Cir. 2023) (section 3563(b)(1) "contemplates *short* periods of confinement like 'nights' and

---

[8] The government defers to the Court regarding the imposition of a fine in this case. Elizalde is not subject to a restitution order because, in the absence of a plea agreement, there is no authority to order restitution.  As noted in the PSR, Elizalde has the ability to pay a fine.  PSR at 10-11.

'weekends' interspersed throughout probation"). The statute was designed to give courts flexibility in the "fashioning of conditions of probation in order to make probation a useful alternative to a term of imprisonment." S. Rep. No. 98-225, at 59 (1983). Because Elizalde has been found guilty by this Court of a violation of 40 U.S.C. § 5104(e)(2)(G), a second-degree misdemeanor, the statutory maximum of total confinement the Court may impose under § 3563(b)(10) is six months.

Judges in this district have imposed intermittent confinement as a condition of probation in many January 6 cases. *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30 days of confinement in three-day intervals as condition of three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42 days of confinement in 14-day intervals as condition of three years of probation). While the statute refers to multiple intervals, a single short interval is also permissible. *See, e.g.*, *United States v. Valentin*, 21-cr-702 (JEB), ECF No. 65 (D.D.C. July 17, 2023) (imposing single 10-day interval of confinement as condition of 12 months of probation); *United States v. Escalera*, No. 22-cr-364 (APM), ECF No. 36 (D.D.C. Aug. 8, 2023) (imposing single seven-day interval as condition of two years of probation); *see also* S. Rep. No. 98-225, at 99 (noting that statute was intended to permit a single "brief period of confinement").

Here, 36 months of probation with a condition of intermittent confinement totaling 30 days, and 60 hours of community service is sufficient, but not greater than necessary, to serve the purposes of sentencing under 18 U.S.C. § 3553(a)(2).

## VI.    Restitution

The government does not seek restitution in this case.[9]

---

[9] Restitution, while recommended by the Probation Office, *see* ECF 47, is neither available nor mandatory in this case as only a single Title 40 conviction is present.  Restitution requires the

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to of 36 months of probation with a condition of intermittent confinement totaling 30 days. The government also requests that this Court impose 60 hours of community service. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Elizalde's liberty as a consequence of his behavior.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Patrick Holvey*
PATRICK HOLVEY
DC Bar No. 1047142
Assistant United States Attorney
United States Attorney's Office
601 D Street N.W.
Washington, D.C. 20530
Telephone: 202-252-7224
Patrick.Holvey@usdoj.gov

</div>

---

presence of a Title 18 conviction (or other statutorily prescribed offense), *see* 18 U.S.C.
§ 3663(a)(1)(A), which is not present here.  Accordingly, restitution is not available or required.

## CERTIFICATE OF SERVICE

On this March 20, 2024, a copy of the foregoing was served upon all parties via the

Electronic Case Filing (ECF) System.

*/s/ Patrick Holvey*
PATRICK HOLVEY
DC Bar No. 1047142
Assistant United States Attorney
United States Attorney's Office
601 D Street N.W.
Washington, D.C. 20530
Telephone: 202-252-7224
Patrick.Holvey@usdoj.gov